996 So.2d 56 (2008)
STATE of Louisiana
v.
Jamal ROBINSON.
No. 2008-KA-0287.
Court of Appeal of Louisiana, Fourth Circuit.
September 24, 2008.
Keva Landrum-Johnson, District Attorney, Donna Andrieu, Assistant District Attorney, *57 Patrick Frischhertz, Law Clerk, Loyola University, New Orleans, LA, for State of Louisiana.
Karla M. Baker, Martin E. Regan, Jr., Regan & Associates, P.L.C., New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY).
DAVID S. GORBATY, Judge.
We preface this opinion by stating that this is a troubling case for this Court's consideration. Jamal Robinson was convicted of aggravated battery, and sentenced to six years at hard labor. However, because of the constraints placed upon a court of review by the legislature and jurisprudence, we affirm his conviction and sentence.

STATEMENT OF THE CASE:
Jamal Robinson ("Robinson") was charged by bill of information with attempt to commit second degree murder, a violation of La. R.S. 14:27(30.1) On May 19, 2005, Robinson was tried and found guilty of aggravated battery in violation of La. R.S. 14:34. He was sentenced to serve six years at hard labor. Robinson orally moved for and was granted an appeal immediately after sentence.[1]

STATEMENT OF FACT:

Testimony of Robin Rucinski:
Robin Rucinski was a four year veteran crime scene technician with the New Orleans Police Department at the time of trial. On November 8, 2003, Ms. Rucinski was called to the scene of a suspected attempted murder. Her report was introduced into the record at trial. She collected four spent nine millimeter casings that were introduced into the trial record. She also took photographs of the scene, which included photos of a blood trail.

Testimony of Sergeant Troy Williams:
Sergeant Troy Williams was assigned to the New Orleans Police Department's Third District Investigative Unit on November 8, 2003. He conducted the followup investigation of the shooting of Brian Smith. Williams obtained an arrest warrant for Robinson for this incident.
Williams did not witness the incident or go to the scene. He obtained his information from speaking to people who were at the scene, and from Detective Sharon Ricks, who responded to the scene. Williams also spoke to other police officers and people from the crime lab unit. He also interviewed Paula Smith, Tanika Smith, and Brandon Bell. Williams wrote a supplemental police report, and testified that Officer Jonathon Rivet wrote the initial incident report.

Testimony of Brian T. Smith:
Brian T. Smith was thirty four years old at the time of trial. He had known Robinson for approximately six years. Robinson and Smith's sister, Tanika Smith, have children together. Brian testified that he had a conviction for possessing crack cocaine.
Although Smith stated that he did not want to testify, he told the jury that Robinson shot him on November 8, 2003. He explained that he saw Robinson at his house earlier in the day, where he lived with his mother; his sister, Tanika; and her two children. Robinson was outside, leaning on his white Cutlass and talking to *58 Tanika. Robinson was with a friend. Smith, his mother and a neighbor were on the porch. Smith got into an argument with Robinson about Robinson's "disrespecting" his and Tanika's mother. Smith admitted at trial that he had consumed two or three beers but denied being inebriated at the time. Robinson's companion told him to get into his car before Robinson could respond to Smith.
When the argument ended, Robinson told Tanika, "You better get your children out the house because it ain't going to be nothing nice when I come back." Smith testified that he then left his home and went to his niece's house on Banks Street.
On the way back home, Smith encountered Robinson again. Robinson was in a different car  a blue Cavalier that Smith believed belonged to Robinson's sister. As Smith turned the corner, he saw the blue car. The car sped up, and shots were fired at Smith. He began to run away, but two of the shots hit him in the right shoulder. Robinson got out of the car and began kicking Smith. Smith did not know how many times Robinson kicked him because he passed out after the first kick. Smith recalled being scared and thinking that Robinson was trying to kill him. The next thing Smith remembered was being in his bathroom when an ambulance arrived. He believed his mother and another person had taken him home.
Smith spoke to the police at the hospital. He initially told them that he did not know who attacked him because he did not want the police involved. However, after his initial denial, Smith informed the interviewing officer that he did know who shot him. Smith did not recall telling the police that Robinson had issued a threat or that Robinson was driving a blue car.

Testimony of Tanika Smith:
Tanika Smith is Robinson's girlfriend and the victim's sister. She had been seeing Robinson for approximately five years at the time of trial and had two children with him. Tanika and Smith's mother is Paula Smith.
At approximately 4 p.m. on the date of the shooting, Smith was inebriated "to where he was falling." Tanika stated that she believed her brother was both drinking and using drugs. Tanika went outside to wait for Robinson and escape "all the confusion" inside. When Robinson arrived, he was with "Brandon." Tanika gave Robinson some clothes that she had washed for him and warned him that her brother intended to confront him. After Robinson had gotten back into his car, Smith exited the house. He went to Robinson's car and began pulling and beating on the door in an effort to get Robinson to exit the vehicle, but Robinson would not. However, Brandon got out of the car to fight Smith, but walked off instead. Robinson then departed in his car; Paula Smith grabbed her son and took him back into the house. Tanika explained that her brother tends to be violent when he drinks.
Tanika denied that Robinson ever told her to get the children and leave. She also denied that Robinson ever disrespected her mother. However, she explained, Robinson and her mother, "was liking each other at one time and then they wasn't." Tanika's mother then did not want Robinson around.
Tanika was not present when her brother was shot. Although Tanika knew that one of Robinson's sisters drove a Jeep, she did not know what kind of car his other sister drove. Tanika testified that she and Robinson met later in the evening after the shooting.
Since the shooting, Tanika has moved out of her mother's house. She does not speak to her mother or brother. However, she had "gone over there for like a week."

*59 Testimony of Detective Sharon Ricks:

Detective Sharon Ricks investigated the November 8, 2003 incident; she was the first detective on the scene. She provided information to Detective Williams, who wrote the police report. Tanika was the first person she interviewed. Tanika informed Detective Ricks that her brother had been drinking alcohol. Detective Ricks then interviewed Paula Smith. Ms. Smith did not see the incident, but told the detective what she had learned from her daughter, Tanika.
Detective Ricks interviewed Brian Smith at the hospital. When asked if she was able to determine if Smith had been drinking, Detective Ricks testified, "[m]y statement about him being impaired was relayed to me through Tanika." At first, Smith denied that he knew who shot him. He also did not tell Detective Ricks that a blue car was involved in the incident. Detective Ricks testified that a few minutes later, Smith admitted that he did know who shot him, but did not want to involve the police. Smith stated that he was not worried about it, and that he did not wish to provide any more statements.

Testimony of Officer Tracy Savala:
Officer Tracy Savala was one of the first responding officers to the crime scene. She responded with Jonathon Rivet, an officer in training. Officer Rivet authored the initial incident report under Officer Savala's supervision, who reviewed the report. Officer Savala was present when Detective Ricks interviewed Paula Smith. Ms. Smith stated that her son had been intoxicated and acting strange while inside their residence. Based upon this information, Officer Rivet marked in his report that Brian Smith was not sober. Ms. Smith also stated that the reason she had exited her residence was to speak to a friend.

Testimony of Jamal Robinson:
Robinson testified that he had two children with Tanika Smith. Robinson saw Brian Smith earlier on the day of the shooting at the house Smith shared with his mother and Tanika. Robinson was there to see Tanika and to pick up some clothes she had washed for him.
According to Robinson, Brian exited the house and fell on the ground before getting back up and walking towards Robinson's car. Brian approached the couple and stood behind Tanika, interrupting their conversation. Smith appeared "real intoxicated;" Robinson estimated Smith's intoxication level to be a ten on a scale of one to ten. Smith cursed at Robinson, but Robinson was not angered because he had seen this behavior before.
Robinson testified that Brandon Bell was in the car with him. Brandon had never met Smith. When Smith started yelling, Brandon exited the vehicle, but Robinson told him not to worry about Smith's behavior. At that point Brandon left, stating, "I'm not staying around here."
According to Robinson, Ms. Smith came out of the house and attempted to take her son in. Robinson continued his conversation with Tanika. However, Ms. Smith was not successful in getting her son back into the house. As Robinson was about to leave, Brian broke away from his mother and returned toward Robinson, but Robinson drove away. Robinson testified that he went home.
Robinson testified that he was thirty years old at the time of trial, and that he had no prior convictions. He denied that either he or his sister owns a blue car. Robinson denied shooting Smith

ERRORS PATENT:
The record reveals no errors patent

*60 DISCUSSION:
Robinson presents two assignments of error: 1) the evidence presented at trial was insufficient to convict him of aggravated battery; and, 2) his six year sentence was unconstitutionally excessive.

ASSIGNMENT OF ERROR NO. 1:
In his first assignment of error, Robinson argues that his conviction is not supported by sufficient evidence because Brian Smith was the only witness at trial to testify that Robinson shot and kicked him. The crux of Robinson's argument is that Smith was "highly intoxicated and highly aggressive toward Mr. Robinson," and thus, the jury should have disregarded his testimony.
This Court has stated the following law in analyzing sufficiency of the evidence arguments:
In assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979); State v. Rose, 607 So.2d 974, 978-979 (La.App. 4th Cir.1992), writ denied, 612 So.2d 97 (La.1993). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution; it must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, Id.

State v. Everett, 99-1963, pp. 5-6 (La. App. 4 Cir. 9/27/00), 770 So.2d 466, 470, rev'd on other grounds, 00-2998 (La.5/14/02), 816 So.2d 1272.
In Everett this Court stated the following regarding convictions based upon victim testimony:
The testimony of the victim alone is sufficient to establish the elements of the offense. State v. Ingram, 29,172, p. 10 (La.App. 2 Cir. 1/24/97), 688 So.2d 657, 664, writ denied, 97-0566 (La.9/5/97), 700 So.2d 505. However, where a witness's testimony is rife with internal contradiction and irreconcilable conflict with the physical evident [sic], that testimony will not be sufficient to support a factual conclusion. State v. Dunn, 30,560 (La.App. 2 Cir. 2/25/98), 709 So.2d 852.
Id.
Furthermore, this Court stated the following on the jury's purview in making credibility determinations:
It is not the function of the appellate court to reassess the credibility of witnesses or to reweigh the evidence; the reviewing court's function is to determine the constitutional sufficiency of the evidence presented. State v. Johnson, 619 So.2d 1102, 1109 (La.App. 4 Cir. 5/13/93), writ denied, 625 So.2d 173 (La.10/1/93). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder. State v. Brumfield, 93-2404 (La.App. 4th Cir. 1994), 639 So.2d 312; State v. Garner, 621 So.2d 1203 (La.App. 4th Cir.1993), writ denied 627 So.2d 661 (La.1993). *61 Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989); Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id. A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
Id., 99-1963, pp. 8-9, 770 So.2d at 471.
Pursuant to La. R.S. 14:33, "Battery is the intentional use of force or violence upon the person of another." Pursuant to La. R.S. 14:34, "Aggravated battery is a battery committed with a dangerous weapon."
At trial, Robinson's counsel admitted in closing argument that "somebody was shot," but argued that the only issue to be considered was "whether or not Jamal Robinson did it." In his brief, Robinson argues that Smith's uncorroborated testimony should have been disregarded by the jury because it was proven that Smith was highly intoxicated on the day of the incident.
Smith, the victim, testified that Robinson shot him and kicked him in the face before he passed out on November 8, 2003. Consistent with this testimony, Robin Rucinski, of the New Orleans Police Department's Crime Lab, testified that she collected four nine millimeter casings from the crime scene. Also consistent with this testimony, Ms. Rucinski testified that she took photos of a blood trail at the victim's home. This evidence is consistent with Smith's testimony that the first thing he recalled after passing out on the street was being in his mother's bathroom waiting for an ambulance.
In an effort to impeach Smith's testimony, Robinson asserts that Smith "was highly intoxicated and was highly aggressive toward Mr. Robinson." We note that evidence exists in the record to support these assertions. First, Robinson testified that Brian was highly intoxicated and attempted to fight with him at Smith's house sometime before the shooting incident. Second, Tanika, Robinson's girlfriend and Smith's sister, testified to similar facts that support Robinson's assertion that Smith was intoxicated and combative toward Robinson earlier in the day before the shooting. Third, Smith admitted at trial that he had argued with Robinson and had consumed alcohol earlier in the day. However, Smith denied being inebriated.
All of the evidence indicates that the defendant and the victim were engaged in an altercation earlier in the day. However, the only evidence that Robinson was the person who shot Smith is Smith's own testimony. There is no physical evidence to link Robinson to Smith's shooting.
To the contrary, the evidence to support Robinson's argument that Smith was too drunk on the day of the shooting to know who shot him is as follows: 1) Robinson's testimony; 2) Tanika's trial testimony and the statement she gave to the investigating officers; and, 3) Officer Savala's trial testimony. Officer Savala testified that Paula Smith, the victim's mother, informed her that Brian had been intoxicated and acting strange. The record contains none of Smith's medical records from his post shooting treatment. Accordingly, no scientific evidence of Smith's state of intoxication exists in the record. Determining the credibility of Smith's trial testimony and that of Robinson, Tanika Smith, and Officer Savala was within the purview of the jury. See Everett, 99-1963, p. 9, 770 *62 So.2d at 471 citing Brumfield, 93-2404, 639 So.2d 312, and Garner, 621 So.2d 1203. Also, this credibility determination involves a weighing of the evidence and does not go to its sufficiency. Id., citing Jones, 537 So.2d 1244 and Tibbs, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652.
The jury was aware that it was highly likely that Brian Smith was under the influence of alcohol, and possibly drugs, on the date of this incident. Despite this knowledge, the jury apparently determined that Smith was a credible witness and that he saw Robinson shoot him and kick him once. The jury also weighed Smith's testimony against other trial testimony including that of Tanika Smith, who is the victim's sister, but also the mother of two of defendant's children.
Although Smith's testimony contained some contradictions, the record does not show that the testimony was rife with internal contradiction. Smith testified that he was shot by Robinson while he was on the sidewalk and Robinson was in the car. However, the police recovered three of the four shell casings on the sidewalk, which indicates that the shooter was also on the sidewalk. Smith also testified that when he saw Robinson, he turned and ran; however, he could not explain how he was shot in the front of his shoulder.
We also cannot say that Smith's testimony irreconcilably contradicts the physical evidence, although we again note that there is no physical evidence linking Robinson to this crime. Bullet casings were retrieved from the scene, however, a gun was never located, nor was it determined that Robinson's fingerprints were on the casings. Smith testified that Robinson was driving a blue Chevy Cavalier owned by Robinson's sister; Robinson denied that his sister owned a blue car, and no blue car was ever located. There are pictures of a blood trail in Smith's house, but it is not disputed that Smith was shot and that his mother brought him back to the house.
Accordingly, after reviewing the evidence in its entirety, this Court cannot say that Smith's testimony alone was sufficient to show that Robinson intentionally battered him with a dangerous weapon by shooting him. However, as stated above, it is not the purview of this Court to reassess the credibility of witnesses or to reweigh the evidence. Everett, 99-1963 at pp. 8-9, 770 So.2d at 471. Thus, we must dismiss this assignment of error without relief.

ASSIGNMENT OF ERROR NO. 2:
In his second assignment of error, Robinson asserts that his six year sentence is excessive in violation of Art. I, § 20 of the Louisiana Constitution. In State v. Smith, 01-2574, pp. 6-7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o law shall subject any person to . . . excessive . . . punishment." (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La. 1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La. 1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have *63 been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462, cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
See also State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Batiste, 06-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Landry, 03-1671 (La. App. 4 Cir. 3/31/04), 871 So.2d 1235.
In Batiste, this Court further explained:
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, supra; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813: The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, "keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." State v. Landry, XXXX-XXXX at p. 8, 871 So.2d at 1239. See also State v. Bonicard, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
06-0875 at p. 18, 947 So.2d at 820.
Pursuant to La. R.S. 14:34, Robinson faced a sentence of up to ten years in prison with or without hard labor and a fine of up to five thousand dollars. At sentencing, the trial court noted that it had received the pre-sentence investigation report,[2] and indicated that Robinson had a "juvenile record for illegal carrying of a weapon" from 1990 and one felony arrest in 1994.
In sentencing Robinson to six years with benefits, the trial court stated the following:
The original charge was attempted second degree murder with the victim testifying that the perpetrator in his car advanced on him as he was walking on the sidewalk with the perpetrator, that being you, being in a vehicle firing out the window several times at him striking him in the forearms and the shoulders, being struck more than once.
The court takes into account the serious nature of this crime, the position that the victim was placed in thinking that he was going to, I'm sure, die on the night when he was shot.
In issuing its sentence, the trial court noted Robinson's criminal history, the severity of the crime, and the impact of the crime on the victim. The trial court also heard Robinson's plea for leniency based upon the fact that he has dependent children and his denial of guilt.
Robinson points to no case law showing instances where an excessive sentence was imposed for an aggravated battery conviction. *64 The State cites two cases in which this Court imposed the maximum ten year sentence pursuant to La. R.S. 14:34, State v. Hawkins, 95-0028 (La.App. 4 Cir. 3/29/95), 653 So.2d 715, and State v. Smith, 94-2588 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034. The State also cites a Second Circuit case that affirmed a five year sentence for aggravated battery, State v. Steward, 42,643 (La.App. 2 Cir. 11/14/07), 969 So.2d 804.
In Hawkins, a ten year sentence for attempted aggravated battery was upheld where the defendant fired two clips of nine millimeter bullets from an assault weapon at the victim's vehicle. The victim's vehicle was struck from the rear as it entered a Holiday Inn parking lot. Hawkin's then approached the victim's vehicle; the victim got out and pleaded for his life. Hawkins first shot up the victim's vehicle, reloaded his gun and followed the victim into the building, where he attempted to shoot his gun. A security guard who was hiding in a back room with the victim, testified that the gun would not shoot. The police arrived shortly thereafter and arrested Hawkins. At sentencing, the trial court noted that although no one was actually shot in the commission of the crime, the fact that Hawkins fired two clips of bullets was an aggravating circumstance, justifying a maximum sentence. In affirming the sentence, this Court stated, "[t]he complete lack of regard for the safety of the victim or others in the vicinity of the crime scene evidences that this defendant is the worst kind of offender." Hawkins, 95-0028 at p. 5, 653 So.2d at 718.
In Smith, the defendant was in an altercation with his cousin at a Christmas party. He later went to his cousin's house, thinking the cousin was there. He shot his gun into the house, grazing a female cousin's leg. He then saw the cousin with whom he'd had the altercation, and shot him three times, killing him. Smith was convicted of second degree murder and aggravated battery.
The trial court, in considering the sentencing guidelines for the aggravated battery conviction, noted the seriousness of firing a gun into a residence on Christmas morning, and the fact that a few minutes later the defendant shot and killed the cousin with whom he had argued. This Court affirmed. Smith, supra, citing Hawkins.
Finally, in Steward, the defendant shot his father in the back of the leg with a shotgun during an argument. At sentencing, the trial court heard testimony that the defendant was respectful but fearful and that the defendant had suffered an abusive home life. The sentencing judge noted that the defendant's four prior convictions were all anger related and that the defendant had failed to attend anger management classes pursuant to a special condition of probation. The sentencing judge also found the crime to be a serious one that could have had a deadly result. However, the trial judge considered the defendant's youth a mitigating factor and imposed a five year sentence. The Second Circuit affirmed. Steward, supra.
Considering this Court's decision in Hawkins affirming a ten year sentence for an aggravated battery committed with a firearm, it does not appear that Robinson's six year sentence is grossly disproportionate to his crime. However, we find Smith distinguishable because in addition to the aggravated battery, Smith was convicted of second degree murder, clearly adding to the severity of the sentence. Nonetheless, the evidence in this case supports the fact that Brian Smith was shot twice in the arm and was treated in the hospital.
We also find this case distinguishable from Steward because the battery in that case occurred during a "face to face" argument, *65 and not sometime after the initial altercation. This crime did not occur in the heat of an argument.
As stated herein, the Louisiana Supreme Court has articulated the rules for setting aside a constitutionally excessive sentence. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1. Applying those rules, we cannot say that the trial court abused its broad discretion or that the sentence is grossly disproportionate to the offense. Accordingly, the six year sentence is affirmed.

CONCLUSION:
It is with much trepidation that this Court affirms Jamal Robinson's conviction. However, Louisiana law provides that a conviction can be upheld based upon the testimony of a single individual. The victim, Brian Smith, testified that Robinson shot him with a gun and then proceeded to kick him at least once. His trial testimony contains no significant inconsistencies, nor does the victim's testimony controvert the physical evidence. We again note that there is a total lack of physical evidence linking Jamal Robinson to this crime. We are nonetheless bound to affirm his conviction because, as a reviewing court, we must not substitute our opinions on witness credibility or reweigh the evidence. Accordingly, there are sufficient facts contained herein to support the conviction for violating La. R.S. 14:34. Further, nothing shows that the trial court abused its discretion in sentencing Robinson. Thus, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The docket master and minute entries fail to note the oral motion for appeal. Robinson filed a Motion for an Out of Time Appeal on December 12, 2006, which was denied by the trial court. After filing a writ to this Court and an application for post conviction relief, the trial court set March 27, 2008 as a return date.
[2] Although requested by this Court, the PSI was never received.